IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIETRICH BLICKENDERFER and | ) | |
| JONATHAN LEMISKA, | ) | |
| | ) | |
| Plaintiffs, | ) | No. _____ |
| | ) | |
| vs. | ) | Hon. _____ |
| | ) | |
| GENERAL NUTRUTON CENTERS, INC. | ) | Electronic Filing |
| and GENERAL NUTRITION CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

This is an action under Section 15(a)(3) of the Fair Labor Standards Act, 29

U.S.C. § 215(a)(3), seeking damages for retaliation.

**I.      PARTIES**

1.      Plaintiff Jonathan Lemiska resides in Laurence Harbor, New Jersey.

During the period of approximately 2007 to July 2012, Lemiska worked as a

Manager and later as a Senior Store Manager for Defendants.  At all times pertinent

to this action, Lemiska worked in GNC "Division 1" under the direction of GNC

Divisional Vice President Vincent Cacace.

2.      Plaintiff Dietrich Blickenderfer resides in Columbia, Maryland.  During

the period of June 2006 to June 2011, Blickenderfer worked for Defendants as a

Manager and later as a Senior Store Manager.  At all times pertinent to this action,

Blickenderfer worked in GNC "Division 2" under the direction of Divisional Vice

President Tom Braemer.

3.      Defendant General Nutrition Centers, Inc. is a Delaware corporation with its principal place of business located at 300 Sixth Avenue, Pittsburgh, PA 15222.

4.      Defendant General Nutrition Corp. is a Pennsylvania corporation with its principal place located at 300 Sixth Avenue, Pittsburgh, PA 15222.  (Defendants are hereinafter referred to collectively as "GNC".)

## II.      JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## III.      OVERVIEW

### A.      GNC's Business and Corporate Structure

7.      GNC sells health and wellness products including vitamins, minerals, and herbal supplements through a network of 2,600 GNC owned stores in the United States.  GNC Answer (ECF Doc. 18) ¶ 7.[1]

8.      GNC staffs each of its stores with a "Manager."  The managers are each assigned to work in a specific GNC store.

9.      GNC's managers are non-exempt for purposes of the Fair Labor Standards Act and are thus legally eligible for overtime compensation for all time worked over forty hours per week.

---

[1] All references are to the pleadings and discovery materials in *Vargas v. GNC*, No. 2:10-cv-867 (W.D. Pa.).

10.     Some GNC managers are promoted to the position of "Senior Store Manager" or "SSM."  Like managers, each SSM operates an individual store. Additionally, SSMs assist Regional Sales Directors ("RSDs") in the supervision of between five (5) to ten (10) managers.

11.     SSMs are non-exempt for purposes of the Fair Labor Standards Act and are legally entitled to overtime compensation for all time worked over forty hours per week.

12.     The RSDs are above the SSMs and are exempt employees.  Each RSD is responsible for a region consisting of approximately twenty-five (25) stores.  The RSDs report to the Divisional Sales Directors or "DSDs."  The DSDs report to the Divisional Vice Presidents ("DVPs"), specifically Mr. Cacace or Mr. Braemer as identified above.  GNC's DVPs oversee hundreds of stores and thousands of employees.  Rule 30(b)(6) Dep. (Vol. II) 252:18-253:18.

**B.     GNC's Time Keeping System and Labor Budgets**

13.     GNC employees record their hours worked using the cash registers located in the stores.  Rule 30(b)(6) Dep. (Vol. I) 54:7-16.

14.     All store level employees, including managers and SSMs, are supposed to enter their time into the cash register system on a daily basis when they begin and end their shifts.  Rule 30(b)(6) Dep. (Vol. I) 32:19-34:11.

15.     The data for each store's employees is held in suspense until the end of the week when the manager reviews and approves the time, issues the store's "Final Payroll Report" or "FPR," and the time is converted into pay by GNC's Compensation Department.  *Id.* 36:19-43; 46:20-47:19.

3

16.     GNC establishes a labor budget for each store.  In relation to the typical store, GNC budgets forty (40) hours of compensable time for the store manager and additional hours for one or more part time employees.  GNC does not budget any amount of time for overtime.

17.     GNC's management personnel regularly review FPRs and other reports and computerized data showing the number of budgeted hours and the number of hours actually worked in relation to each store, region, and division. These reports also track the use of overtime.

18.     GNC's time-keeping system permits managers to "adjust" previously entered time.  Rule 30(b)(6) Dep. (Vol. I) 60:19-61:12.

19.     The "adjustment" process involves "changing the entry that's in the system already to something else."  Rule 30(b)(6) Dep. (Vol. I) 47:16-19.

**C.     GNC's *De Facto* Policy Against Overtime**

20.     Although managers and SSMs are nominally eligible to collect overtime compensation, for a number of years GNC has strongly discouraged managers and SSMs from recording overtime.

21.      GNC's executives (the DVPs, DSDs, and RSDs) regularly circulated reports regarding labor costs with particular emphasis on the issue of overtime irrespective of whether the overtime was completely unavoidable due to the best efforts of the store managers and SSMs and was due to legitimate circumstances which could not be controlled by proper planning, as opposed to instances where overtime was simply the product of poor management practices.  *E.g.,* Rule 30(b)(6) Dep. Ex. 39.

4

22.     The company likewise issued reports, which were distributed widely throughout the company, and which identified individuals and the amounts of overtime they worked regardless of whether or not the overtime was appropriate. *See e.g.* Rule 30(b)(6) Dep. Ex. 40 & 41.  Following the company wide broadcast e-mails against overtime mentioned in this Complaint, to appear on one of these reports, identified by name and by the amount of overtime charged, regardless of the circumstances, was considered a negative performance indicator and was designed to call management attention to the individuals on the report.

23.     Although GNC's written policies generally required advance approval of overtime, likewise, during this same time period, GNC completely changed the approval process for overtime and inserted numerous levels of supervisory approval necessary to incur overtime, ultimately requiring the concurrence of the highest levels of GNC's management, and the foregoing made it literally impossible to receive upper management approval for the overtime, prior to incurring the overtime, as many of the circumstances that required overtime to be incurred, were due to unforeseen or exigent circumstances that made prior approval impossible.

24.      The Divisional Sales Directors (Mr. Cacace and Mr. Braemer) both issued division-wide directives strongly indicating that overtime would not be tolerated.

25.     Mr. Cacace instructed the DSDs and RSDs working under him in Division 1:

> I want the over time shut down and no one is allowed to work 1 hour of over time unless it is prior approved by Vince [Divisional Sales Director Mariani] or myself.  I want each of you to drill down on base each week and match the actual pay

against the hours called in/schedules."  If I find a store out of
budget and no warning issued – I will issue the warnings
myself.

Rule 30(b)(6) Dep. Ex. 42.

26.    In another email Mr. Cacace instructed his DSDs to "[s]hut down the

overtime both full and part time."  Rule 30(b)(6) Dep. 39.  Mr. Cacace instructed the

executives that if actual wages for a manager's store exceeded pre-approved

budgeted hours for two pay periods in a row the manager was to be fired.  *Id.*

27.    RSDs in Division 1 routinely used a labor budget spreadsheet, which

included the admonition:  "**There is no overtime!  Do not allow your managers

or part-timers to use it.**"  *E.g.,* GNC1010161 (emphasis in original).

28.    DVP Tom Braemer issued similar directives with respect to Division 2.

For example (after receipt on February 24, 2009 of the January 2009 Overtime

Report) on February 27, 2009, Braemer sent an e-mail to his thirty-two (32) RSDs

and three (3) DSDs in which he states in relation to overtime, "[t]he abuse stops

Now.  I have not heard back from the DSD's and whether they knew about this or

not.  OT is an exception only and using 12k is not an exception, it is an abuse.  I

expect that managers who are abusing this, have a final on file."  Rule 30(b)(6) Dep.

Ex. 34.[2]  Six months later, Braemer similarly wrote to the Division 2 executives, "I

did not approve, nor was I made aware that we would use 2,000 more OT hours for

managers and over 200 more hours for PT.  I NEED THIS EXPALINED (sic), AND I

DON'T WANT TO HEAR RE-SET."  Rule 30(b)(6) Dep. Ex. 51.  Another six months

---

[2]    A "final" refers to a final written warning prior to termination.  Poulin Dep. (Vol.
I) 56:17-57:3.

later, on April 10, 2010, Braemer sent another widely circulated email with the subject line "Overtime is out of control."  Jeffers Dep. Ex. 12.

29.     DSDs in Divisions 1 and 2 regularly cracked down on overtime in response to the directives from DVPs Cacace and Braemer.

30.     For example, on February 24, 2009 at 9:19 a.m., Alan Wells, the DSD in Plaintiff Blickenderfer's reporting chain, sent the January 2009 Overtime to a group of RSDs.  DSD Wells announced on behalf of Braemer a new procedure, not included in the company's employment manual, requiring that any requests for overtime be approved by a DSD.  Wells further instructed the RSDs to "GET THIS UNDER CONTROL NOW."  Rule 30(b)(6) Dep. Ex. 36.

### D.     The Recurring Issue of Off-the-Clock Work and GNC's Contradictory Response

31.     GNC regularly received reports that managers and SSMs were unable to complete their assigned duties within the budgeted forty-hour workweek and were working off-the-clock in order to get their jobs done.

32.      For example, in a letter of resignation, a manager and former SSM, wrote to her RSD, "I have never worked so hard at anything in my life and loved it. However I would never do it again.  All the hours I worked off-the-clock in stores and at home on reports." Slaughter Dep. Ex. 1.

33.     Another GNC manager wrote at the time of her resignation, "I do know that I've worked many hours of overtime after clocking out to make the GNC Expectations happen." Pagan Exhibit "4" at GNC 1015557.

34.     In June 2010, GNC was sued in *Vargas v. GNC,* Civil Action No. 2:10-867 under the Fair Labor Standards Act for maintaining a *de facto* policy against overtime.

**E.     Allegations as to Jonathan Lemiska**

35.     Plaintiff Jonathan Lemiska started with GNC as a part time sales associate in 2006 and was promoted to manager in 2007.  In 2009 he was promoted to SSM.

36.     During the time period of 2009 to the fall of 2011, Lemiska regularly recorded between ten (10) and twenty (20) hours of overtime per week as authorized by his RSD, Mr. John Telencho.

37.     However, in late 2011, there were several staffing changes and Telencho ceased to be Lemiska's RSD and Mr. Kristopher Soder became his DSD. After the appointment of Soder, Mr. Ray Rada was appointed as Lemiska's RSD.

38.     In contrast to Telencho, Soder and Rada rejected Lemiska's requests for permission to charge overtime.  Lemiska recalled, "[t]heir policy from the get-go was no overtime.  There is no budget for it.  It was not allowed.  It was made clear several times that nobody was allowed to work overtime."  Lemiska Dep.  p. 139, lns. 5-8.

39.     Because he could not perform his job within the allotted forty (40) hour workweek, Plaintiff Lemiska worked off-the-clock.  He did this because, based on discussions with Soder and Rada, he "felt that if I didn't get those things done without clocking in for the overtime that my job would be in very serious jeopardy." *Id.* p. 48, lns. 22-24.  Lemiska further testified, "[t]hey would deny the request [for

overtime] and I would tell them that it wasn't possible to get these tasks done without working overtime and they would say things like well, you have to figure it out." *Id.* p. 50, lns. 11-15.

40.     On at least one occasion, RSD Rada instructed Lemiska to "[d]elete time that I had worked or I would be written up for it." *Id.* p. 51, lns. 3-6.   On other occasions, Rada called Lemiska and told him "that I went over my budget and that if it happened again I would be written up and the next time after that I would be terminated." *Id.* p. 95, lns. 8-11; *see also* Cacace email of April 14, 2010 to District 3 team at GNC 1008687 ("Any manager not in budget – I want a written warning issued and a copy e-mailed to me.").

41.     In late 2011, Lemiska was approached by a GNC manager, Mr. Mike Campanelli, who informed him that at Rada's request he had worked several "inventories" off-the-clock, but with the assurance from Rada that he would later be permitted to charge back his overtime.   Campanelli was later told by Rada that it was too late to charge back his overtime and thus he faced the prospect of having at least forty (40) hours of uncompensated work.

42.     In response to Campanelli's request for assistance, Lemiska contacted GNC's Human Resources and spoke to "Charmelle" and its Loss Prevention Department where he spoke with "Sean" and informed them that the manager had worked off-the-clock per instructions from the RSD and that he (Lemiska) wanted to report the overtime to ensure that the manager was paid. (Lemiska initially did not approach Rada directly because he was afraid that he might respond negatively to such an inquiry.)  GNC's Human Resources Department in Pittsburgh and Loss

Prevention Departments took the position that it was ultimately up to the RSD, Rada whether or not the employee should be paid for his off-the-clock work.  Lemiska then approached Rada directly and told Rada that he knew that Campanelli had worked the hours and that "you know he was there.  We got to get this taken care of. He has to get paid*.*"  Id. p. 149, lns. 14-22.  In response, Rada said it was too late and there was nothing that could be done.  Lemiska then told Rada "he couldn't keep cheating employees out of money that they had a right to or he was going to end up having nobody working for him because people wouldn't stand for it and everybody would quit."  *Id.* p. 150, ln. 2-6.

43.     During the same time period, Lemiska complained on several occasions to Rada about a decision to increase the hours of operation for the strip mall stores without increasing the labor budget or permitting overtime, which would require the managers involved to work off-the-clock and this was known to both Rada and Lemiska.  Rada asked Lemiska to assist him in monitoring GNC employees to ensure that they were working the extra hours.  Lemiska told Rada that he was not comfortable with this because "I felt I was setting them up to be terminated for something that was out of their control."  *Id.* p. 155, ln. 9 to p. 156, ln. 6.

44.     In April 2012, shortly after his inquiries on behalf of Campanelli and his complaints about the increase in store operating hours, Lemiska for the first time received a negative evaluation and was placed on a "thirty day performance plan."  Lemiska felt that Rada was "targeting me to be terminated because I was very

vocal about not being supportive of some of the practices that he was putting through[.]" *Id.* p. 158, lns 2-5.

45.     Plaintiff Lemiska's receipt of a negative evaluation, prompted him for a second time to call GNCs Human Resources Department at its headquarter in Pittsburgh.  During a phone call of approximately thirty (30) minutes, Lemiska again spoke with Charmelle of the HR Department.  Lemiska told Charmelle "that what he [Rada] was doing was wrong and that it was immoral and bringing down everyone's demeanor and that I felt like my job was in jeopardy and that I was being singled out to I guess be made an example of[.]" *Id.* p. 158, lns. 14-19.

46.     Approximately one week later, DVP Cacace, DSD Soder and RSD Rada visited Lemiska in his store.  The visit by Cacace (who oversaw 500 or more stores) was highly unusual.  During the meeting, Rada, Soder, and Cacace assured Lemiska that his job was not in jeopardy.  However, two weeks later Lemiska was terminated for "insubordination."

47.     The assertions that Lemiska's job performance had declined and that he engaged in insubordination were pretextual excuses intended to provide a basis for his termination.  In fact, GNC terminated Lemiska because he complained about the company's no overtime policies and related requirements for off-the-clock work.

**F.     Allegations as to Plaintiff Blickenderfer**

48.     Plaintiff Blickenderfer was hired by GNC in June 2006 as a manager and was "promoted" to SSM (without pay change) in August 2006. .  Blickenderfer did not actually start receiving SSM pay until approximately August or September 2007.  He was thereafter told on a recurring basis that he was under serious

consideration for promotion to RSD, but remained in the SSM position until  the

time of his termination.  He reported to RSD Kevin Long who, in turn, reported to

DSD Allen Wells and DVP Braemer.

49.     Blickenderfer worked in a high volume "A" store and was also

responsible for monitoring between five (5) to seven (7) other stores.

50.     Prior to calendar year 2008, Blickenderfer generally recorded all

overtime he worked in GNC stores.  From the outset of his employment at GNC, his

recording of overtime would prompt some questioning or negative comments.

However, beginning in January 2008, GNC began cracking down on overtime to the

point that "no overtime" became a regular theme in his dealings with management.

51.     For example, in January 2008,  DSD Wells called Blickenderfer and

instructed him not to have any more overtime clocked in.

52.     Also beginning in January 2008, RSD Long heavily emphasized the "no

overtime theme" during the weekly conference calls involving all managers in

Blickenderfer's region.

53.     Additionally, as an SSM, Blickenderfer participated in weekly

conferences involving other SSMs and RSDs as well as DSDs and the DVP.  Beginning

in January 2008 in these calls, Blickenderfer would regularly hear DSD Wells and

DVP Braemer emphasize the "no overtime" theme.   Indeed, these members of

senior management would criticize the RSDs that had incurred overtime in their

regions and explain to them that they would be subject to severe criticism by the

DVP if they permitted employees working under them to claim overtime

54.     During this same time frame, GNC kept reducing the number of labor hours that it budgeted for Blickenderfer's store (KK52).  For example, GNC originally budgeted 150 to 160 labor hours to Store KK52, but during this time frame it consistently reduced the budgeted hours to approximately 100 per week to accomplish the same work that had been done previously with a labor budget roughly 50% larger.

55.     During the same period, GNC's management also both increased the performance expectations and workload in Blickenderfer's own store and with regard to his work as an SSM

56.     The combination of inadequate staffing, insufficient budget hours, and increasing workloads produced pressure on Blickenderfer to work overtime. Despite his best efforts, he consistently found it impossible to get the required work done in the allotted hours.  He thus found that he had no choice but to work overtime.  However, this need directly conflicted with the repeated "no overtime" instructions that he had received from RSD Long and DSD Wells.

57.     During early 2008, Blickenderfer recorded some overtime.  However, under the pressure from management outlined above, in 2008 he began recording only portions of his overtime.  Specifically, Blickenderfer recorded only limited overtime that would keep him within his store's approved labor budget.  He thus might work thirty (30) hours of overtime in a particular week, but would only record, for example, twelve (12) hours, because to record the remaining eighteen (18) hours of overtime, would take his store over its budget.

58.     By the week ending January 17, 2009, Blickenderfer had largely ceased to record any overtime and continued to refrain from doing so until separation from GNC in 2011.  Blickenderfer consistently recorded exactly forty hours per week, but worked an additional thirty (30) hours or more off-the-clock per week.  Blickenderfer regularly adjusted his recorded time to eliminate overtime.  These adjustments were so extensive as to be obvious to GNC management and Loss Prevention personnel.

59.     In discussions with RSD Long and DSD Wells, Blickenderfer repeatedly stated that the "overtime situation is getting out of hand", "it is really stressful" and that he and other managers were "working overtime and not getting paid for it" or words to that effect.

60.     The situation first came to a head in April 2010 when Blickenderfer was directed to attend a meeting at GNC's headquarters in Pittsburgh.  During the Pittsburgh meeting, DSD Wells together with several RSDs rolled out the "Train the Trainer" program.   They said that this program was designed to train SSMs on how to train managers and part time associates in sales techniques and to monitor their performance progress.  During the meeting, Blickenderfer openly expressed the opinion in front of DSD Wells and numerous RSDs that it was wrong to add to the administrative burdens of the SSMs and managers because of the overtime issue and the fact that it was already impossible to get the job done in the allotted time and SSMs and managers were being forced to work off-the-clock.

61.     Following the meeting, Wells personally drove Blickenderfer back to Columbia, Maryland. (Blickenderfer received a ride to the conference with RSD Thomas Slaughter.)  During the car ride, Wells explained at length that a person in Blickenderfer's position just had to figure out a way to get the job done within the labor budget and without recording overtime.  Blickenderfer directly questioned Wells on this and openly indicated that he believed that GNC's expectations were wrong and illegal.

62.     As a direct result of attending the meeting in Pittsburgh described in the preceding paragraph, Blickenderfer was unable to complete  the large amount of paperwork and "inventory prep." that had not been completed as his home store. This outstanding work was substantial in itself due to the large sales volume of that store.

63.     When Blickenderfer got back to Columbia, Maryland, his RSD (Long) confronted him and harshly criticized him for not completing his store paperwork. RSD Long then proceeded to write up Blickenderfer for failing to complete his "inventory prep."

64.     Specifically, RSD Long issued two warning notices (dated April 16 and April 19, 2010), relating to the inventory "prep." and the inventory itself.  These warnings stated that Blickenderfer faced termination if his inventory practices did not improve.  Blickenderfer's clear sense at the time was that these warning notices were issued with the approval of Wells who had indicated in his discussions with Blickenderfer that he was aware of the  paperwork issues being raised by RSD Long. Thereafter, on or about April 19, 2010, RSD Long called Blickenderfer to reprimand

him for the inventory issues.  Blickendefer in response expressed to RSD Long in

very vehement terms that he was being forced to work thirty (30) hours or more

per week off-the-clock while at the same time receiving criticism and being

threatened with loss of job because he did not complete all of his paperwork

responsibilities.  This telphone conversation lasted at least half an hour.

65.     During the following year Blickenderfer repeatedly raised the issues

of labor budgets that necessitated working off-the-clock and uncompensated

overtime on a weekly basis when he met with GNC management personnel.

66.     In April 2011, Blickenderfer attended a divisional meeting in place of

RSD Long who was unavailable due to a death in his family.  During the meeting,

Wells and Braemer were trying to roll out additional sales tracking systems.  At this

meeting, as during the April 2010 meeting, Blickenderfer complained that it was

unfair and improper to add to the duties of the managers and SSMs when they were

already overwhelmed with paperwork requirements.  During the meeting a few

RSDs openly agreed with Blickenderfer.  Braemer reacted to Blickenderfer's

comments by stating that all work had to be completed within budget and he did not

want any employees recording overtime.  In response, Blickenderfer openly

expressed his view that this was simply impossible as the increased workload

coupled with the reduced budget for labor costs, created a circumstance where off-

the-clock work would be expected.

67.     Shortly after this meeting in early May of 2011, GNC "audited"

Blickenderfer's store.  At this time, Blickenderfer had already repeatedly told RSD

Long that his store inventory count was still incorrect and that he could not catch up

on the paperwork because he was already working thirty (30) or more hours per week off-the-clock.  The "audit" was pretextual in nature as RSD Long already knew that Blickenderfer's store inventory was inaccurate because Blickenderfer was not able to keep up with his extraordinary work load.  The "audit" was performed strictly for the purpose of providing a justification for the termination of Blickenderfer.  In reality, the paperwork issue addressed in the audit was not RSD Long's actual concern (as the same issue was overlooked in prior years in light of Blickenderfer's outstanding sales performance), but he and his superiors used the issue raised in the audit as a basis for terminating Blickenderfer in retaliation for his continued complaints.

**COUNT I**
**VIOLATION OF FSLA § 15(a)(3)**

68.     The allegations of paragraphs 1 to 67 are incorporated by reference as if fully rewritten herein.

69.     Plaintiffs "filed any complaint" within the meaning of FLSA § 15(a)(3).  Their complaints were "sufficiently clear and detailed for a reasonable employer to understand [them], in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Kasten v. Saint-Gobain Performance Plastics Corp.,* __ U.S. __, 131 S. Ct. 1325, 1335, 179 L. Ed. 2d 379 (2011).

70.     In violation of FLSA § 15(a)(3), GNC retaliated against Plaintiffs for "filing any complaint" within the meaning of FLSA § 15(a)(3).

71.     In the alternative, GNC's management retaliated against Plaintiffs because management perceived that Plaintiffs had "filed any complaint" or were about to file complaints within the meaning of FLSA.  *Brock v. Richardson,* 812 F.2d 121 (3d Cir. 1987).

72.     The violations of FLSA alleged herein were willful and entitle both Plaintiffs to liquidated damages and application of a three-year statute of limitations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a.     An order reinstating the named plaintiffs from the positions from which they were discharged.

b.     An award of compensatory damages in the form of lost wages for the maximum three year period in light of the willful nature of the violation

c.     An award of liquidated damages in the amount of twice Plaintiffs' lost wages.;

d.     Compensatory damages for the humiliation, pain and suffering experienced by Plaintiffs as a result of Defedants' illegal conduct;

e.     Costs and expenses of this action including reasonable attorney's fees and expert witness fees;

f.     Pre-judgment and post-judgment interest to the extent provided by law; and

g.      Such further and additional relief as the Court deems just.


A JURY TRIAL IS DEMANDED TO THE EXTENT AVAILABLE UNDER LAW.


                                      Respectfully submitted,


Dated:  October 24, 2013              s/ Adrian N. Roe
                                      Adrian N. Roe
                                      Pa. Bar No. 61391
                                      Andrew G. Nagurney
                                      Pa. Bar No. 313589
                                      Adrian N. Roe P.C.
                                      Suite 1331 The Gulf Tower
                                      707 Grant Street
                                      Pittsburgh, PA 15219
                                      (412) 434-8187
                                      aroe@roelawoffice.com

                                      s/ Michael D. Simon
                                      Michael D. Simon, Esq.
                                      Pa. Bar No. 32941
                                      2520 Mosside Boulevard
                                      Monroeville, PA  15146
                                      (412) 856-8107
                                      mdsimon20@msn.com